

# THE ATTORNEY GENERAL
# OF TEXAS

### AUSTIN, TEXAS 78711

**JOHN L. HILL**
**ATTORNEY GENERAL**

November 12, 1974

The Honorable Marlin Brockette
Commissioner of Education
Texas Education Agency
210 East 11th Street
Austin, Texas 78701

Opinion No. H- 448

Re: The obligation of
the Commissioner of
Education to equalize
assessment ratios
before using them in
the county economic
index formula.

Dear Dr. Brockette:

You have asked our opinion on two questions which are:

    1. In calculating the economic index, should this office require each county's tax assessor to report, along with the assessed valuations of the county, the percentage of market value used in determining the assessed values reported?

    2. If you have answered the above question in the affirmative, should this office use such information in computing the county economic index to achieve equality and uniformity of property values of each county as compared with every other county?

    Similar questions were among several issues presented in <u>Fort Worth Independent School District, et al v. Edgar, et al.</u>, Civil Action 4-1405 (N. D. Tex., Fort Worth Division). That case was filed in 1970, and a three judge court was appointed. Plaintiffs in that case were the Fort Worth, Dallas, and Houston Independent School Districts along with taxpayers and students from each district. Allocation of funds under the minimum foundation program (hereafter MFP) was attacked on several grounds including the use of property assessments at less than full market value in determining the county economic index, which is the issue raised in your two questions.

This office represented the defendants in the suit and asserted several defenses. These defenses included a challenge to the standing of the plaintiffs to litigate the issues presented in the case. During the course of the litigation the United States Supreme Court issued its opinion in San Antonio Independent School District v. Rodriguez, 411 U.S. 1 (1973). Rodriguez had the effect of deciding substantial portions of the Fort Worth lawsuit in a manner adverse to the plaintiffs' claim. In the latter part of 1973 the Fort Worth litigation was voluntarily dismissed. Subsequently, your predecessor, who was a defendant in the lawsuit, submitted these two inquiries to this office for an opinion to be issued in our quasi-judicial role under Article 4399, V.T.C.S.

The present questions were not before the Supreme Court in Rodriguez. The contentions in that case centered on the inter-district disparities in per-pupil expenditures caused by the variations in different school districts' ad valorem tax bases. Although the Court recognized that assessment practices in Texas are not uniform, there is no indication that it considered the effect of the use of non-equalized assessments in determination of the county economic index. Rodriguez, supra, at p. 46, n. 100.

Your two questions are substantially narrower than those raised by Rodriguez or by Fort Worth Independent School District. They relate solely to the figures employed in calculating one factor which is used in determining the county economic index.

It is unnecessary to set out the details of the highly complex MFP in this opinion. It will suffice to say that the economic index for each county is determined from a formula spelled out in Sec. 16.74, Texas Education Code. Its application is a major factor in the determination of each district's local fund assignment, which is the amount a district is required to contribute as its share of the MFP. Although the local fund assignment ultimately computed for a given district may be affected by various statutory credits and adjustments not germane to this request, the amount of state aid received generally corresponds to the economic index calculated for the county in which the district lies. If the economic index is high, the local fund assignment will be high, and the amount of state aid received under the MFP will be low. On the other hand, if the economic index is low, the local fund assignment will be low, and the amount of state aid received will be high.

The economic index for each county is based on three weighted factors.  Income for the county is measured by value added by manufacture, value of minerals and agricultural products, and the total of payrolls for retail, wholesale and service establishments.  This factor is weighted by 72.  The scholastic population of the county is weighted by 8, and the assessed property valuation of the county is weighted by 20.

You indicate that:

> It is common knowledge that many county tax assessor-collectors in this state customarily assess property subject to ad valorem taxes at less than 100% market value, and that there is a wide variation from county to county in the assessment ratios used (see Governor's Committee Report on School Financing--1967).  Some school districts contend that the disparity in the assessments by the county tax assessor-collector vary from 3% to 100% of fair market value.

The practical effect of assessment at a low percentage of market value is a low economic index and a resultant high amount of state aid under the MFP.

Your first inquiry concerns your ability to obtain information from tax assessors on the assessment ratio employed in their counties.

Section 16.79(a) of the Education Code imposes the duty on the State Board of Education and the Commissioner "to take such action, <u>require such reports</u>, and make such rules and regulations consistent with the terms of this chapter <u>as may be necessary to carry out its provisions.</u>"  (Emphasis added)

Three Attorney General Opinions have been addressed to similar points.  Attorney General Opinion V-1195 (1951) construed Article 2922-16, Sec. 3, V. T. C. S. [now Sec. 16.74, Education Code] and held that in adjusting a county's economic index to reflect a sudden and marked decline in economic activity, the Commissioner was free to consider information from sources other than those listed in the statute if the information was not reflected in the statutorily designated source.  The Opinion stated that, "unless the Commissioner can look to other reliable sources of information, it might not be possible to compute an index accurately indicating the taxpaying ability of each county."

Attorney General Opinion WW-452 (1958) said that the various sources of information then being used by the Commissioner to obtain the necessary data for the computation of the index were not exclusive. The only statutory requirement was that the information be taken " 'from the most recently available official publications and reports of agencies of the State of Texas or the Federal Government.' "

Attorney General Opinion M-262 (1968) discussed adjustments made by the State Board of Education to reflect changes in economic activity. That opinion indicated that:

> In computing the economic index . . . the Board is confined to data taken from the most recently available official publications and reports of Federal and State agencies.  Although being thusly confined, it is the opinion of this office that the Board may consider any official State or Federal publications or reports; and if the Board deems it proper or necessary in considering the question of an adjustment, it has the authority to arrange for and make available to itself other and further such official reports and publications as it may deem necessary in order to properly and wisely make its decisions.  This same principle is true with regard to the compilation of economic indices in the future. (Emphasis in original)

It appears well settled that the commissioner has the authority to require any official report he may deem necessary for the proper performance of his statutory functions. If he is permitted or required to utilize values which have been corrected to offset fractional assessment practices, it seems clear to us that he can require tax assessors to report the percentage of market value that has been used in arriving at the assessed property values reported.

Your second inquiry is whether the Commissioner should utilize such information in computing the county economic index to reflect equal and uniform property assessment ratios among the state's 254 counties.  In answering this question it is important to recognize that if differing percentages of valuation are employed from county to county in determining assessed property valuation to be reported to the Commissioner, the

inevitable result is to distort calculation of the county economic index in favor of those counties using lower assessment percentages unless these assessed values are adjusted to reflect an equal standard of assessment.

One of the basic rules of statutory construction is that a statute should be construed in a manner that will sustain its constitutionality unless the plain import of its provisions renders such an interpretation impossible. State v. Shoppers World, Inc., 380 S.W. 2d 107 (Tex. 1964); Newsom v. State, 372 S.W. 2d 681 (Tex. Crim. 1963); McKinney v. Blankenship, 282 S.W. 2d 691 (Tex. 1955). A recent federal case, Levy v. Parker, 346 F.Supp. 897 (E.D. La. 1972) (3 judge court) aff'd. mem., 411 U.S. 978 (1973), involved questions which are very similar to those presented in your inquiry and has established the constitutional limits within which we must construe your statutory duties in computing the county economic index. It should be noted that the affirmance of Levy by the United States Supreme Court came subsequent to that court's Rodriguez decision and that the case was not presented to the three judge court in the plaintiff's brief in the Fort Worth case.

The question in Levy involved a state revenue sharing scheme designed to reimburse parishes for the cost of a homestead tax exemption provided in the state constitution. Reimbursement by the state was proportionate to the parishes' tax or millage rates.

In Louisiana, as elsewhere, property tax revenue is a function of the assessed value of property and the rate of tax. Thus, a parish faced with local requirements for a certain amount of tax revenue benefited most from the homestead reimbursement provisions by minimizing assessments and maximizing its millage rates. The Texas MFP formula works in essentially the same manner since the lower the assessed value the higher the amount of state aid under the MFP. In Louisiana constitutional and statutory limitations effectively precluded some parishes from raising their tax rates and thus qualifying for higher rebates. Likewise, county tax rates in Texas are limited, e.g., Article VIII, Section 9, Texas Constitution. When a county reaches the maximum tax rate it must assess property at a higher

percentage of true value if it is to generate more revenue. A county which is relatively poor in value of taxable property will be required to reach its maximum tax rate sooner than a relatively rich county and will then be required to increase its assessment rate if it is to raise more tax money. Thus, the poorer a county is the less able it is to manipulate its assessment ratio to generate larger amounts of state aid for its school districts. Conversely, the richer the county, the more able it is to adjust its assessment ratio.

In discussing the Louisiana plan the federal court observed:

> . . . The millage-times-assessment-any-basis-you-choose formula for distributing state funds is, in a word, arbitrary. It establishes a rule for distributing state funds that is no rule at all.
>
> . . .
>
> No reason has been advanced, nor any governmental policy argued, that would support the reimbursement of each Louisiana parish on the basis now in effect. It has not been suggested that the amounts now being paid to any parish are based on its real loss of revenue resulting from the homestead exemption, or on state policy based on any rational geographical or demographic classification, or on any other basis that might constitute coherent governmental policy.
> Levy v. Parker, supra, at 903-904.

The court accordingly held the Louisiana rebate system unconstitutional.

Given the Levy precedent, we believe the use of unequalized assessment values in determination of the county economic index for purposes of the MFP presents constitutional problems. See, Weissinger v. Boswell, 330 F. Supp.615 (M.D. Ala. 1971); Yudof, The Property Tax in Texas Under State and Federal Law, 51 Texas Law Review 885 (1973).

In construing the statute we are required to be guided by the intent of the Legislature while at the same time giving the statute an interpretation most calculated to sustain its constitutionality.

We believe the language of the statute is consistent with a construction which will avoid constitutional pitfalls. For example, in actually levying the maintenance taxes from which local fund assignments are paid, all school districts except common school districts are free under Sec. 20.03 Texas Education Code, to assess property "on any basis authorized or permitted by any applicable law, " including Title 28, V. T. C. S., applicable to cities and towns, which permits fractional assessment. It may have been to avoid varying fractional assessments bearing no relation to local taxpaying ability that the Legislature selected for inclusion in the MFP's economic index formula valuations by the county --a taxing jursidiction theoretically required to assess at 100% of market value and forbidden from adopting "a lower or different standard of value"(Articles 7149, 7174, V. T. C. S.), although in actual practice lesser values were used. See e. g., Lively v. Missouri, Kansas and Texas Railway Co., 120 S. W. 852 (Tex. 1909); Robertson v. Connecticut General Life Insurance Co., 140 S. W. 2d 936 (Tex. Civ. App. --Waco 1940, no writ). Also, use of the largest tax assessing unit, the county, rather than the multitude of school districts in the state is more consistent with a program based on equalized and standardized effort. County assessments if performed according to the common standards thus prescribed, would afford a far more accurate means of comparing local fiscal capacities than would the assessments actually made by districts pursuant to Sec. 20.03. Moreover, such county assessments would better serve the basic intent of the MFP financing provisions, which is to determine local contributions to the program on the basis of relative taxpaying ability. Further support for the view that there was an intent to prescribe a common valuation standard appears in the valuation reporting provision of Sec. 16.77(a), the formula for determining district local fund assignments in Sec. 16.76(a) and the maintenance tax credit provisions of Sec. 16.76(e), all of which are tied to the county valuation standard.

Additional aid to construction is found in the basic purpose of the MFP itself, which is to assure an equal minimum educational opportunity for each school-aged child by providing state aid in compensation for variations in local taxpaying ability. The program is to be financed in

part by an "equalized, local school district effort" (Sec. 16.71) assigned to each district "according to its taxpaying ability" (Sec. 16.73).   The manner of adjustment presented in your second question would plainly further this purpose.

Therefore, we answer both of your questions in the affirmative. The Commissioner should require counties to report the percentage of true value at which they assess property.   He should then utilize the information received from the counties in computing the Minimum Foundation Program county economic index.   Your questions are phrased narrowly, and it has not been necessary to consider the legality or propriety of county tax assessors assessing property at a fraction of its full value or their determination of what constitutes taxable property.

Our function essentially is to predict the resolution of a question which would be reached were it presented to a court.   Our courts possess broad powers of equity and often utilize their equitable discretion to grant stays, to allow phased implementation of an order or to permit other means of ameliorating the effect of its decisions.   At least one provision of the Education Code is designed to lessen the effect of any sudden shifts in the factors constituting  the county economic index.   Section 16.74(c) of the Education Code provides that the index is to be computed from a three-year average of data.   Although a court's order conceivably could require full market value assessment figures to be used in figures for all three years used in computing the index for the coming school year, we believe that utilization of the corrected figures for the current year and following years would be within the equitable discretion of a court. Under such an arrangement some effect of the corrected data would be felt immediately but the full effect would not be realized until the third year.

## SUMMARY

The Commissioner of Education should require
each county's tax assessor to report the percentage
of market value used in determining the assessed

value of property in that county. The Commissioner should use this information in computing the county economic index to achieve uniformity of property values of each county as compared with every other county.

Very truly yours,

JOHN L. HILL
Attorney General of Texas

APPROVED:

LARRY F. YORK, First Assistant

DAVID M. KENDALL, Chairman
Opinion Committee